## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

<table>
<tr><td>MICHAEL A.,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Plaintiff,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>v.</td><td>)</td><td>1:24CV548</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>FRANK J. BISIGNANO,</td><td>)</td><td></td></tr>
<tr><td>Commissioner of Social</td><td>)</td><td></td></tr>
<tr><td>Security,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Defendant.[1]</td><td>)</td><td></td></tr>
</table>

## MEMORANDUM OPINION AND ORDER
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Michael A., brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Commissioner of Social Security (the "Commissioner"), denying Plaintiff's claim for Disability Insurance Benefits ("DIB"). (Docket Entry 1.) The Commissioner has filed the certified administrative record (Docket Entry 3 (cited herein as "Tr. __")), and both parties have submitted dispositive briefs in accordance with Rule 5 of the Supplemental Rules for Social Security Actions under 42 U.S.C. § 405(g) (Docket Entry 8 (Plaintiff's Brief); Docket Entry 9 (Commissioner's Brief); Docket Entry 10 (Plaintiff's Reply)). For the reasons that follow,

_____

[1] The United States Senate confirmed Frank J. Bisignano as the Commissioner of the Social Security Administration on May 6, 2025, and he took the oath of office on May 7, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Frank J. Bisignano should substitute for Carolyn W. Colvin as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

the Court will remand this matter for further administrative proceedings.[2]

## I. PROCEDURAL HISTORY

Plaintiff applied for DIB (Tr. 211-15), alleging a disability onset date of July 31, 2020 (see Tr. 211, 214). Upon denial of that application initially (Tr. 104-12, 133-37) and on reconsideration (Tr. 113-26, 139-43), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 144-45). Plaintiff, his attorney, and a vocational expert ("VE") attended the hearing. (Tr. 39-103.) The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act. (Tr. 14-38.) The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-6, 208-10), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that decision, the ALJ made the following findings later adopted by the Commissioner:

1. [Plaintiff] meets the insured status requirements of the . . . Act through September 30, 2026.

2. [Plaintiff] has not engaged in substantial gainful activity since July 31, 2020, the alleged onset date.

3. [Plaintiff] has the following severe impairments: ankylosing spondylitis, degenerative disc disease, and degenerative joint disease.

. . .

---

[2] On consent of the parties, "this case [wa]s referred to the [undersigned] United States Magistrate Judge . . . to conduct all proceedings . . ., to order the entry of judgment, and to conduct all post-judgment proceedings []herein." (Docket Entry 7 at 1.)

4. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

5. . . . [Plaintiff] has the residual functional capacity to perform light work . . . with the ability to lift, carry, push, and/or pull 20 pounds occasionally and 10 pounds frequently; sit for 6 hours in an 8-hour workday; stand and/or walk for 4 hours in an 8-hour workday; frequently push and/or pull with the bilateral lower extremities; climb occasionally; frequently balance as that term is defined in the [Dictionary of Occupational Titles ('DOT')] and [Selected Characteristics of Occupations ('SCO')]; and occasionally stoop, kneel, crouch, and crawl.

. . .

6. [Plaintiff] is unable to perform any past relevant work.

. . .

10. Considering [Plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [he] can perform.

. . .

11. [Plaintiff] has not been under a disability, as defined in the . . . Act, from July 31, 2020, through the date of th[e ALJ's] decision.

(Tr. 19-32 (bold font and internal parenthetical citations omitted).)

## II. DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v.

3

<u>Barnhart</u>, 453 F.3d 559, 561 (4th Cir. 2006).  However, "the scope of . . . review of [such a] decision . . . is extremely limited." <u>Frady v. Harris</u>, 646 F.2d 143, 144 (4th Cir. 1981).  Even given those limitations, the Court will remand this case for further administrative proceedings.

### A.  Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974).  Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard."  <u>Hines</u>, 453 F.3d at 561 (internal brackets and quotation marks omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Hunter v. Sullivan</u>, 993 F.2d 31, 34 (4th Cir. 1992) (quoting <u>Richardson v. Perales</u>, 402 U.S. 389, 390 (1971)).  "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001) (internal brackets and quotation marks omitted).  "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence."  <u>Hunter</u>, 993 F.2d at 34 (internal quotation marks omitted).

4

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3] "To regularize the

<hr/>

[3] The Act "comprises two disability benefits programs. [DIB] . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . .

5

adjudicative process, the Social Security Administration [('SSA')] has . . . promulgated . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id. (internal citations omitted).

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity [('RFC')] to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[4]  A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry.  For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied.  The second step

_____

for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

    [4] "Through the fourth step, the burden of production and proof is on the claimant.  If the claimant reaches step five, the burden shifts to the [government] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's [RFC]." Id. at 179.[5] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the government cannot

---

[5] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. <u>Hines</u>, 453 F.3d at 567.[6]

## B. Assignments of Error

Plaintiff asserts that the Court should overturn the ALJ's finding of no disability on these grounds:

1) "[t]he ALJ's RFC determination is unsupported by substantial evidence because the ALJ failed to provide valid reasons for disregarding Plaintiff's testimony relating to his physical and mental impairments" (Docket Entry 8 at 3 (bold font and block formatting omitted); <u>see also</u> Docket Entry 10 at 1-5); and

2) "[t]he ALJ's RFC determination is not supported by substantial evidence and is the product of legal error because she improperly evaluated the medical opinion of [consultative psychological examiner] Philip Hatfield, Ph.D." (Docket Entry 8 at 14 (bold font and block formatting omitted); <u>see also</u> Docket Entry 10 at 5-6).

The Commissioner contends otherwise and seeks affirmance of the ALJ's decision. (Docket Entry 9 at 4-18.)

─────────────

[6] A claimant thus can qualify as disabled via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. <u>See, e.g.</u>, <u>Hunter</u>, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

### 1. Evaluation of Plaintiff's Subjective Symptom Reporting

In Plaintiff's first issue on review, he argues that "[t]he ALJ's RFC determination is unsupported by substantial evidence because the ALJ failed to provide valid reasons for disregarding Plaintiff's testimony relating to his physical and mental impairments." (Docket Entry 8 at 3 (bold font and block formatting omitted); see also Docket Entry 10 at 1-5.) In that regard, Plaintiff faults the ALJ for discounting Plaintiff's subjective statements because 1) "Plaintiff's treatment records 'reflect considerable alcohol consumption which his pain management providers had advised him was not appropriate with his current medication regimen'" (Docket Entry 8 at 4 (quoting Tr. 26 (in turn citing Tr. 737, 1283, 1294, 1306, 1317, 1321, 1369))), 2) "[t]here is a 10-month gap in his primary care provider's (Dr. [James] McGrath's) treatment records from October 2021 until August 2022'" (id. at 6 (quoting Tr. 26 (internal parenthetical citations omitted) (in turn citing Tr. 911-44, 1351))), 3) "Plaintiff testified that he has been taking [the] medication Enbrel for two years, but the 'record shows [Plaintiff] had been taking Enbrel for less than two years as of the date of the hearing'" (id. at 8 (quoting Tr. 27)), 4) "[Plaintiff] was performing activities of daily living such as 'feeding, dressing, and bathing himself, handling his own personal hygiene, grooming, fixing simple meals, going grocery shopping, and doing his own house cleaning, laundry,

and vacuuming, washing dishes, taking out the trash, driving a car, and caring for pets'" (id. at 9 (quoting Tr. 27)), and 5) "objective medical findings" did not support Plaintiff's statements (id. at 10 (citing Tr. 26)). According to Plaintiff, "[t]he ALJ's rejection of Plaintiff's testimony results in harmful error[, because] Plaintiff was aged 49 years 9 months at the time of the ALJ's decision" (id. at 13 (citing Tr. 30)) and, "[i]f limited to a sedentary RFC, he would be found disabled pursuant to Medical Vocational Rule 201.14" (id.). In addition, "the [VE] testified that if Plaintiff is off-task from work for 10 percent or more of the workday, or would miss two days of work on a monthly basis, those limitations would preclude competitive work." (Id. (citing Tr. 92-93).) For the reasons that follow, Plaintiff has shown that the ALJ failed to support her evaluation of Plaintiff's subjective symptom reporting with substantial evidence, warranting remand.

The Commissioner's regulations adopt a two-part test for evaluating a claimant's statements about symptoms. See 20 C.F.R. § 404.1529; see also Social Security Ruling 16-3p, Titles II & XVI: Evaluation of Symptoms in Disability Claims, 2017 WL 5180304, at *3 (Oct. 25, 2017) ("SSR 16-3p"). First, the ALJ must determine whether a claimant has a "medically determinable impairment that could reasonably be expected to produce [the claimant]'s symptoms, such as pain." 20 C.F.R. § 404.1529(b); see also SSR 16-3p, 2017 WL 5180304, at *3. A claimant must provide "objective medical evidence from an acceptable medical source" to establish the

10

existence of a medically determinable impairment "which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529(a); see also SSR 16-3p, 2017 WL 5180304, at *3. Objective medical evidence consists of medical signs ("anatomical, physiological, or psychological abnormalities that can be observed, apart from [a claimant's] statements" and "must be shown by medically acceptable clinical diagnostic techniques," 20 C.F.R. § 404.1502(g)) and laboratory findings ("anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques," 20 C.F.R. § 404.1502(c)). See 20 C.F.R. § 404.1502(f); see also SSR 16-3p, 2017 WL 5180304, at *3.

Upon satisfaction of part one by the claimant, the analysis proceeds to part two, which requires an assessment of "the intensity and persistence of [the claimant's] symptoms," as well as "the extent to which [those] symptoms limit [his or her] capacity for work." 20 C.F.R. § 404.1529(c); see also SSR 16-3p, 2017 WL 5180304, at *4. In making that determination, the ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." SSR 16-3p, 2017 WL 5180304, at *4. Where relevant, the ALJ will also

11

consider the following factors in assessing the extent of the claimant's symptoms at part two:

> 1. [ D]aily activities;
>
> 2. The location, duration, frequency, and intensity of [] pain or other symptoms;
>
> 3. Precipitating and aggravating factors;
>
> 4. The type, dosage, effectiveness, and side effects of any medication [a claimant] take[s] or ha[s] taken to alleviate [] pain or other symptoms;
>
> 5. Treatment, other than medication, [a claimant] receive[s] or ha[s] received for relief of [] pain or other symptoms;
>
> 6. Any measures [a claimant] use[s] or ha[s] used to relieve [] pain or other symptoms (e.g., lying flat on [his or her] back, standing for 15 to 20 minutes every hour, or sleeping on a board, etc.); and
>
> 7. Any other factors concerning [a claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3); see also SSR 16-3p, 2017 WL 5180304, at *7-8. The ALJ cannot "reject [a claimant's] statements about the intensity and persistence of pain or other symptoms or about the effect [those] symptoms have on [the claimant's] ability to work solely because the available objective medical evidence does not substantiate [the claimant's] statements." 20 C.F.R. § 404.1529(c)(2) (emphasis added); see also SSR 16-3p, 2017 WL 5180304, at *5.

In this case, the ALJ found, at part one of the subjective symptom analysis, that Plaintiff's "medically determinable

12

impairments could reasonably be expected to cause the alleged symptoms," but then determined, at part two, that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms [we]re not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in th[e ALJ's] decision." (Tr. 23.) The ALJ supported her part two finding with the following analysis:

> The limitations set forth in the above [RFC] are supported by [Plaintiff]'s medically-observed symptoms and limitations. The [ALJ] also took into account [Plaintiff]'s testimony in formulating the [RFC]. However, a more restrictive [RFC] is not warranted. Although some examinations do show some restricted range of motion of the spine, and [Plaintiff] has reported and been treated for pain, paraspinal muscle strength and tone were generally within normal limits, and normal gait and station were often noted, along with intact sensation to light touch in the extremities, no evidence of distress, and appearance of being comfortable at rest. . . .

> Treatment records reflect considerable alcohol consumption, which [Plaintiff's] pain management providers had advised him was not appropriate with his current medication regimen.

> There is a 10-month gap in his primary care provider's (Dr. McGrath's) treatment records from October 2021 until August 2022. Because [Plaintiff] testified he had been attending monthly appointments with Dr. McGrath throughout this time, the [ALJ] allowed [Plaintiff]'s attorney additional time to try to locate those records. However, following the attorney's efforts, the provider said there were no additional records. This is a significant inconsistency, and such a lengthy gap in treatment is inconsistent with the degree of symptoms alleged and suggests [Plaintiff]'s symptoms were reasonably well controlled during that time.

> [Plaintiff] testified that he is on Enbrel (etanercept) and takes it once a week. He testified that he started

13

taking it two years earlier and cannot yet tell any benefit. He further testified that Dr. McGrath just said to try it longer. However, the record shows that while Enbrel had been prescribed in November 2020 and approved as of September 2021, as of October 2021, [Plaintiff] was still not yet taking Enbrel. Thus, the record shows [Plaintiff] had been taking Enbrel for less than two years as of the date of the hearing.

[Plaintiff] also reports being able to perform an array of activities of daily living including feeding, dressing, and bathing himself, handling his personal hygiene, grooming, fixing simple meals, going grocery shopping, and doing his own house cleaning, laundry, and vacuuming, washing dishes, taking out the trash, driving a car, and caring for pets. Although [Plaintiff] testified to having curtailed some of these due to his medical conditions, his driving has been reduced due to a DWI charge the previous summer.

In all, these medical findings and reported activities of daily living reflect [Plaintiff]'s ability to perform work-related activities within the extensive limitations set forth in [the RFC]. Although he may not be able to perform them at the same level as he did prior to the onset of his impairments, the [ALJ] finds that [Plaintiff] is able to perform them in some limited capacity and has reflected these limitations in the [ RFC].

(Tr. 26-27 (emphasis added) (internal parenthetical citations omitted).)

Plaintiff first challenges the ALJ's "state[ment] that Plaintiff's treatment records 'reflect considerable alcohol consumption which his pain management providers had advised him was not appropriate with his current medication regimen.'" (Docket Entry 8 at 4 (quoting Tr. 26 (in turn citing Tr. 737, 1283, 1294, 1306, 1317, 1321, 1369)).) In that regard, Plaintiff notes that "pain management records referenced by the ALJ [] acknowledge that

14

Plaintiff is 'a social drinker' as part of his social history" (id.
(quoting Tr. 717)), but lack "any actual statements . . . warning
Plaintiff due to his alcohol use or [for] having a positive [urine
drug screen] due to alcohol" (id. at 5). Plaintiff further points
out that none of "the record[s] reflect that [he] ever presented
with signs of intoxication during the relevant period," and that
"records referenced by the ALJ . . . indicate that Plaintiff 'is
cutting back' his use of alcohol." (Id. (quoting Tr. 1283, 1294,
1317).) Additionally, Plaintiff observes that Dr. McGrath,
"Plaintiff's primary care provider, not[ed] that Plaintiff might
have an element of alcoholic gastritis[ and t]hus, the record
indicates that Plaintiff's use of alcohol would impact only
his . . . gastroesophageal reflux disease." (Id. (citing Tr.
1321).) Plaintiff also argues that the ALJ's attempt to allege
non-compliance by Plaintiff regarding his alcohol use . . . is
flawed" (id.), because "'[SSR] 16-3p only allows ALJs to question
a claimant's testimony for failing to follow "prescribed"
treatments[, and ] does not address non-compliance with
"recommended" ones'" (id. (quoting Rebecca B.R. v. O'Malley, No.
1:23CV238, 2024 WL 4348999, at *7 n.7 (M.D.N.C. Sept. 30, 2024)
(unpublished) (Peake, M.J.))).[7]

---

[7] Plaintiff contends that the ALJ also erred by failing to "assess whether
[he] 'would expect the prescribed treatment, if followed, to restore
[Plaintiff]'s ability to engage in [substantial gainful activity]'" pursuant to
Social Security Ruling 18-3p, Titles II and XVI: Failure to Follow Prescribed
Treatment, 2018 WL 4945641 (Oct. 2, 2018) ("SSR 18-3p"). (Docket Entry 8 at 5-
6.) However:

The ALJ's observation that "[t]reatment records reflect considerable alcohol consumption, which [Plaintiff's] pain management providers had advised him was not appropriate with his current medication regimen" (Tr. 26) fails to provide a cogent basis for discounting Plaintiff's subjective reports regarding the intensity and persistence of his pain.  Although the record supports both that Plaintiff continued to drink alcohol while receiving narcotic pain medication (see, e.g. Tr. 1317 (documenting Plaintiff's report on October 20, 2022, to Dr. McGrath that his "[w]ife had expressed concern over his alcohol consumption," that Dr. McGrath "reviewed th[at issue with Plaintiff,] and [that] he sa[id] he [wa]s cutting back")), as well as that his pain management providers cautioned Plaintiff against consuming alcohol

---

SSR 18-3p supplies guidance about how the SSA will apply its regulations, including 20 C.F.R. § 404.1530, when a claimant fails to follow prescribed treatment and when otherwise doing so would enable a claimant to work.  SSR 18-3p, 2018 WL 4945641, at *1-2 (Oct. 2, 2018).  Of significance here, SSR 18-3p only applies after the SSA (or an ALJ) finds "that an individual is entitled to disability . . ., *regardless of whether the individual followed the prescribed treatment.*"  *Id.* at *3 (emphasis added).  In such cases, the SSA then considers whether that person's medical source prescribed treatment for the disabling impairment, whether the person followed such treatment, whether having done so would restore the ability to work, and whether good cause existed for not following the prescribed treatment.  *Id.* at *3-6.

The ALJ made no finding of disability so SSR 18-3p does not apply.  *See Myers v. Comm'r of Soc. Sec.*, 456 F. App'x 230, 232 (4th Cir. 2011) (rejecting argument that [SSR 82-59,] predecessor to SSR 18-3p[,] applied in absence of a finding of disability).

Matthew C.G. v. Commissioner of Soc. Sec., No. 2:22CV453, 2023 WL 9788011, at *17 (E.D. Va. Dec. 5, 2023) (unpublished), recommendation adopted sub nom. Matthew C.G. v. O'Malley, 2024 WL 761856 (E.D. Va. Feb. 23, 2024) (unpublished).  Similarly, the ALJ here did not find Plaintiff disabled and thus SSR 18-3p does not apply to the ALJ's non-compliance finding in this case.

while taking narcotics (see, e.g. Tr. 1246 (reflecting that, on October 6, 2022, pain management provider "[d]iscussed [with Plaintiff] the prohibition on use of pain meds with alcohol . . . without discussing with the provider")), the ALJ failed to explain why those facts diminished the consistency of Plaintiff's pain complaints with the record (see Tr. 26). Beyond noting the boilerplate recitation of the above-quoted prohibition on consuming alcohol with narcotics without discussing it with the provider contained in each of the provider's treatment records, the ALJ did not point to any instances in which those providers specifically found that Plaintiff's alcohol use interfered with the efficacy of his pain medications, worsened the physical impairments that caused his pain, violated the pain contract Plaintiff maintained with the clinic, resulted in the discontinuation of narcotic prescriptions, or caused his discharge from that pain clinic. (See id.) Absent an explanation from the ALJ, the record could equally support the implication that Plaintiff continued to drink alcohol notwithstanding his use of narcotics in an effort to self-medicate his pain and/or mental symptoms. Thus, the alcohol-narcotics noncompliance observation by the ALJ does not provide substantial evidence to support her discounting of Plaintiff's subjective symptom reports.

Next, Plaintiff objects to the ALJ's "discount[ing] Plaintiff's testimony on the ground that '[t]here is a 10-month gap

17

in his primary care provider's (Dr. McGrath's) treatment records from October 2021 until August 2022'" (Docket Entry 8 at 6 (quoting Tr. 26 (internal parenthetical citations omitted) (in turn citing Tr. 911-44, 1351))), and also "stat[ing] that additional time was allowed to let [Plaintiff]'s attorney request those records, but 'the provider said there were no additional records'" (id. (quoting Tr. 26 (in turn citing Tr. 1380-82)) (internal parenthetical citation omitted)). According to Plaintiff, Plaintiff's rheumatologist, Dr. Robert Wodecki with Carolina Speciality Care, P.A., and not Plaintiff's primary care physician, Dr. McGrath, indicated that no treatment records of Plaintiff existed for the time frame of October 1, 2021, to May 22, 2023. (See id. (citing Tr. 923, 1080, 1380-82).) Plaintiff further points out that "[t]he last request for Dr. McGrath's records was previously faxed on August 10, 2022" (id. (citing Tr. 1183)), but "contains an inbound fax error report after printing one [treatment] record dated August 10, 2022, and states that only 10 pages were received out of 68 pages" (id. (citing Tr. 1183, 1193)). In Plaintiff's view, "it is likely that there were more records available from Dr. McGrath for the period from October 2021 through August 2022, but they were not received" (id. at 7), and Plaintiff contends that "[a]n alleged gap in treatment that is later found to be a mischaracterization of the evidence is insufficient to serve as substantial evidence supporting the rejection of a claimant's testimony" (id. (citing

Rogers v. Berryhill, No. 1:17CV438, 2018 WL 4100048, at *4
(M.D.N.C. Aug. 28, 2018) (unpublished) (Peake, M.J.),
recommendation adopted, slip op. (M.D.N.C. Sept. 25, 2018) (Eagles,
J.))).

The ALJ erred when she found that, after she "allowed
[Plaintiff]'s attorney additional time to try to locate [Dr.
McGrath's] records [between October 2021 and August
2022,] . . . [Dr. McGrath] said there were no additional records."
(Tr. 26 (emphasis added) (citing Tr. 1380-82).) As Plaintiff
argues (see Docket Entry 8 at 6), Plaintiff's rheumatologist Dr.
Wodecki, and not Plaintiff's primary care physician Dr. McGrath,
indicated that no records existed for the time period from October
1, 2021, to May 22, 2023. (Tr. 1382.)[8]

Beyond that error by the ALJ, the record otherwise supports
that treatment records existed from Dr. McGrath during the period
from October 2021 to August 2022. As Plaintiff points out

_____

[8] Plaintiff's hearing-level attorney may have contributed to the ALJ's
error in this regard. During the hearing, Plaintiff's attorney requested and
received a three-week extension of time to obtain Dr. McGrath's missing records
from October 2021 to August 2022. (See Tr. 84-87.) However, following the
hearing, Plaintiff's attorney sent the ALJ a letter indicating that:

> When the hearing was conducted there was to be some post hearing
> follow up with [Plaintiff]'s provider Carolina Specialty Care. We
> have made multiple contact[s] to the facility[, and] they are
> requesting more time to provide records. They have provided status
> that records should be submitted to our firm by May 25, 2023.

(Tr. 435 (emphasis added).) Indeed, Carolina Speciality Care sent a letter dated
May 22, 2023, indicating that they possessed no treatment records for Plaintiff
during the time period from October 1, 2021, to May 22, 2023. (See Tr. 1382.)
Those factual circumstances strongly suggest that Plaintiff's hearing-level
attorney mistakenly sent the follow-up request to Carolina Speciality Care rather
than to Dr. McGrath, and would further explain why the ALJ found that Dr. McGrath
had indicated no further treatment records existed (see Tr. 26).

19

(see Docket Entry 8 at 6), a fax from Dr. McGrath's office purporting to send 68 pages of medical records from October 8, 2021, to August 10, 2022 (see Tr. 1184), experienced a transmission error and successfully sent only the first 10 pages of the fax (see Tr. 1193), consisting of Dr. McGrath's treatment note of Plaintiff on August 10, 2022 (see Tr. 1189-92). As Dr. McGrath's office sent other batches of medical records in reverse chronological order (see Tr. 744-831, 1273-1361), the missing 58 pages of the fax sent on August 10, 2022, likely contained treatment records pre-dating August 10, 2022. Moreover, as Plaintiff notes, "Dr. McGrath ordered imaging of [Plaintiff's right] hip on November 18, 2021" (Docket Entry 8 at 7 (citing Tr. 967)),[9] "prescribed a compounded medication [consisting of viscous xylocaine and Maalox suspension] and Metamucil on January 19, 2022" (id. (citing Tr. 1190)), "diagnosed Plaintiff with a new problem of history of stricture of esophagus on March 30, 2022" (id. (citing Tr. 1191)), and "prescribed [the] medications [c]etirizine 10 mg, [f]lucticasone, and [o]ndansetrom HCL 4 mg on April 20, 2022" (id. (citing Tr. 1190), all of which strongly suggests that Dr. McGrath actually

_____

[9] Dr. McGrath's treatment note dated October 7, 2021, reflects that Plaintiff had a follow-up appointment on November 18, 2021 (see Tr. 943), the same date that Dr. McGrath ordered the x-ray of Plaintiff's right hip (see Tr. 967). In addition, a Report of Contact with Dr. McGrath on October 18, 2021, identified Plaintiff's next appointment date as November 1, 2021. (See Tr. 377.)

20

treated Plaintiff on multiple occasions between October 2021 and August 2022.[10]

The ALJ found that "such a lengthy gap in treatment" constituted "a significant inconsistency," which "suggest[ed Plaintiff]'s symptoms were reasonably well controlled during th[e] time [from October 2021 to August 2022]." (Tr. 26 (emphasis added).) As another judge of this Court found when reviewing an ALJ's erroneous reliance on "significant gaps in treatment," "it is difficult to view this mischaracterization of the evidence as simply a harmless misstatement, particularly in light of the ALJ's reliance on this assertion as a basis for find[ing] that Plaintiff's statements regarding the intensity, persistence and limiting effects of [his] symptoms [we]re not generally consistent with the medical evidence and other evidence in the record." Rogers, 2018 WL 4100048, at *4 (internal quotation marks omitted).

Plaintiff additionally contests the ALJ's "state[ment] that Plaintiff testified that he ha[d] been taking [the] medication Enbrel for two years, but the 'record shows [Plaintiff] had been taking Enbrel for less than two years as of the date of the hearing.'" (Docket Entry 8 at 8 (quoting Tr. 27).) According to Plaintiff, "[t]he record reflects that Plaintiff had access to

_____

[10] The record does not explain why neither Plaintiff's hearing-level attorney nor his current counsel obtained the missing records from Dr. McGrath, which they could have then submitted post-hearing to the ALJ, to the Appeals Council, or to this Court in pursuit of a remand under sentence six of 42 U.S.C. § 405(g).

Enbrel on October 7, 2021, but had not yet started the medication"
(id. (citing Tr. 940)), that he "reported during his psychological
consultative examination [on June 1, 2022,] that he was taking
Enbrel once a week" (id. (citing Tr. 1090)), and that "Dr.
McGrath's August 10, 2022, treatment note [] indicates that Enbrel
was last filled on June 15, 2022" (id. (citing Tr. 1190)).
Plaintiff contends that "[t]he ALJ fail[ed] to explain how th[e]
alleged inconsistency of [taking Enbrel for] one year versus two
years is material and significant as to the issue of Plaintiff's
ability to work." (Id. (citing Tr. 27).)

The ALJ's observation that "the record show[ed Plaintiff] had
been taking Enbrel less than two years" (Tr. 27) did not provide
substantial evidence supporting the ALJ's decision to discount
Plaintiff's subjective symptom reports. Although the record, as
outlined by Plaintiff above, indicates that, as of October 7, 2021,
Plaintiff had not yet started Enbrel (see Tr. 940), and, thus, that
he could not have taken it for two years by the time of the hearing
on May 10, 2023, as he testified (see Tr. 59), the ALJ failed to
explain the significance of that discrepancy (see Tr. 27). Due to
the absence of Dr. McGrath's treatment records between October 7,
2021, and August 10, 2022, the record does not clarify the precise
time Plaintiff started Enbrel, but he reported taking it once per
week at his consultative psychological examination on June 1, 2022
(see Tr. 1090). Thus, the record shows Plaintiff had taken Enbrel

for at least 11 months prior to the hearing. Although Plaintiff testified that Dr. McGrath characterized Enbrel as a "long-term" medication (Tr. 59), and encouraged Plaintiff to continue taking it to "rejuvenate [his] joints" (Tr. 60), the record lacks any statement from Dr. McGrath (or explanation from the ALJ) indicating a specific length of time that Plaintiff should have taken Enbrel before experiencing symptom improvement. Under such circumstances, the difference between Plaintiff taking Enbrel for one versus two years did not provide a sound basis for discounting Plaintiff's subjective symptom reports.

Plaintiff further objects to the ALJ's "state[ment] that Plaintiff's testimony should be discounted on the basis that he was performing activities of daily living such as 'feeding, dressing, and bathing himself, handling his own personal hygiene, grooming, fixing simple meals, going grocery shopping, and doing his own house cleaning, laundry, and vacuuming, washing dishes, taking out the trash, driving a car, and caring for pets.'" (Docket Entry 8 at 9 (quoting Tr. 27).) In that regard, Plaintiff asserts that "'[a]n ALJ may not consider the type of activities a claimant can perform without also considering the extent to which []he can perform them.'" (Id. (quoting Smith v. Kijakazi, No. 1:22CV16, 2023 WL 2142704, at *4 (M.D.N.C. Feb. 21, 2023) (unpublished) (Peake, M.J.) (in turn quoting Woods v. Berryhill, 888 F.3d 686, 694 (4th Cir. 2018)) (internal quotation marks omitted),

23

recommendation adopted, slip op. (M.D.N.C. March 13, 2023) (Schroeder, C.J.)).) Plaintiff describes the qualifications he placed on his abilities to engage in daily activities as follows:

> Plaintiff explained that "standing in the kitchen is difficult for [him]," he is "limited in his ability to walk while preparing meals," and he can need help with lifting and carrying for household chores such as taking out the garbage or performing laundry. [(Tr. 353.)] He further explained that he prepares meals for only 15 minutes, he performs laundry up to only 30 minutes one to two times a week, he washes dishes up to only 30 minutes one to two times a week, and he takes out the trash lasting up to 15 minutes one to two times per week. [(Id.)] Plaintiff also stated that he has difficulty sitting in the car for driving and that getting in and out of the car is difficult. [(Tr. 354.)] He noted that he shops in a store for only up to 15 minutes due to problems walking, lifting groceries, and standing. [(Id.)] He stated that he has to sit down while dressing and has difficulty reaching while bathing. [(Tr. 352.)] These limited chores and problems with performing self-care do not demonstrate an ability to stand and walk for a prolonged duration of 4 hours in an 8-hour workday or lift and carry up to 20 pounds.

(Id. at 10.)

Plaintiff's above-described limitations on his ability to perform daily activities accurately capture Plaintiff's statements on a Function Report dated May 5, 2021. (Compare id., with Tr. 351-60.) Moreover, at the hearing just over two years later, Plaintiff further qualified his ability to perform household chores, testifying that his wife does his laundry and all housework (see Tr. 66), except that he could rinse a few dishes for five minutes (see Tr. 77). The ALJ adverted to Plaintiff's qualifications on his daily activities by stating that, "[a]lthough

24

[Plaintiff] testified to having curtailed some of [his activities] due to his medical conditions, his <u>driving has been reduced due to a DWI charge the previous summer</u>." (Tr. 27 (emphasis added).) Yet, that statement fails to adequately capture Plaintiff's activity qualifications, because it acknowledged that he "curtailed some of [his activities]" (<u>id.</u>), but then discounted only the reduction in his <u>driving</u> as caused by a non-medical reason, and did <u>not</u> reject his statements about the minimal amount of household tasks he performed or the difficulty he had performing self-care. As such, the ALJ's reliance on Plaintiff's daily activities provided little support for the ALJ's decision to discount Plaintiff's subjective symptom reporting.

Lastly, Plaintiff faults the ALJ for "reject[ing] Plaintiff's testimony on the basis of his objective medical findings." (Docket Entry 8 at 10 (citing Tr. 26).) In Plaintiff's view, the "'ALJ must build an accurate and logical bridge from the evidence to h[er] conclusion that [Plaintiff]'s testimony was not credible'" (<u>id.</u> at 11 (quoting <u>Brown v. Commissioner Soc. Sec. Admin.</u>, 873 F.3d 251, 269 (4th Cir. 2017)) (internal quotation marks omitted)), and contends that "the ALJ fail[ed] to explain why the following evidence [wa]s inconsistent with Plaintiff's statements: his repeated showing of restricted lumbar range of motion and difficulty getting up from a chair" (<u>id.</u> (citing Tr. 717, 722, 731, 736, 879, 896, 902, 987, 1016, 1022, 1039, 1053, 1059, 1138, 1147,

25

1153, 1159, 1165, 1174, 1210, 1220, 1227, 1234, 1245, 1254, 1368));
"walking slowly with a stiff back" (id. (citing Tr. 256, 284, 615,
672, 775, 780, 786, 792, 796, 861, 926, 936, 942, 1192, 1347,
1356)); "a 2+ effusion of the right knee" (id. (citing Tr. 1349));
"a 3+ effusion of the right knee" (id. (citing Tr. 1285, 1296,
1307, 1319)); "a positive straight leg raise" (id. (citing Tr.
1349, 1358)); "[] abnormal tandem walk, wide-based gait, limited
cervical and lumbar range of motion, and positive left Spurling's
sign" (id. at 11-12 (citing Tr. 1198-99)); and "knee synovitis"
(id. at 12 (citing Tr. 1298)).  Plaintiff further points out that
his "imaging [] supports the severity of his impairments" (id. at
13 (citing Tr. 952, 1096, 1203)), and faults the ALJ for "stat[ing]
that the evidence showed 'no evidence of distress' during
examinations" (id. at 12 (quoting Tr. 26)), when "the record
documents that Plaintiff exhibited mild distress" (id. (citing Tr.
256, 306, 775, 780, 786, 800, 1285, 1296, 1317)), "and moderate
distress" (id. (citing Tr. 284, 615, 792, 796, 1330)).

On one hand, the ALJ here made observations regarding the
objective medical evidence in the record that supported, to some
extent, the ALJ's RFC finding.  For example, the ALJ noted that,
prior to Plaintiff's alleged onset date of disability, a former
pain management "provider specifically noted 'diversion is
suspected by [Plaintiff] due to his repeat negatives with
medications, no shows, over utilization and his demeanor [] in the

26

office, guarded, no eye contact and shaking'" (Tr. 23 (quoting Tr. 528) (ellipsis and internal quotation marks omitted)), and that "the pain management clinic discharged [Plaintiff] from care for failure to show for a mandatory pill count" (Tr. 23-24). The ALJ further observed that, on certain examinations, Plaintiff had "normal motor strength and tone" (Tr. 24), "grossly intact sensation" (id.), "normal gait and station" (id.), "normal reflexes" (id.), and displayed "no objective evidence of distress" (Tr. 25), as well as the "appearance of being comfortable at rest" (id.).[11]

On the other hand, the ALJ also acknowledged the following objective evidence, which supported Plaintiff's reports of severe pain:

- "[i]n September 2020, [Plaintiff] presented to [Dr. McGrath]" and "[e]xamination showed that [Plaintiff] walked a bit slowly due to hip pain and a stiff back" and "limited range of motion and pain with passive movement of both hips" (Tr. 24);

---

[11] Plaintiff contests the ALJ's "state[ment] that the evidence showed 'no evidence of distress' during examinations" (Docket Entry 8 at 12 (quoting Tr. 26)), when "the record documents that Plaintiff exhibited mild distress" (id. (citing Tr. 256, 306, 775, 780, 786, 800, 1285, 1296, 1317)), "and moderate distress" (id. (citing Tr. 284, 615, 792, 796, 1330)). However, the ALJ actually stated that, "[a]lthough some examinations do show some restricted range of motion of the spine, and [Plaintiff] has reported and been treated for pain, paraspinal muscle strength and tone were generally within normal limits, and normal gait and station were often noted, along with intact sensation to light touch in the extremities, no evidence of distress, and appearance of being comfortable at rest." (Tr. 26 (emphasis added) (citing Tr. 533, 615, 672, 699, 861, 953-67, 1198-99, 1285, 1319, 1330, 1368).) Moreover, the ALJ's citation of records showing no distress (see id. (citing Tr. 533, 672, 861, 1368)), mild distress (see id. (citing Tr. 699, 1285, 1319)), and moderate distress (see id. (citing Tr. 615, 1330)) further confirms that the ALJ did not intend to find that Plaintiff's examinations always showed no evidence of distress.

27

- "[i]n December 2020, . . . [e]xamination [by a pain management provider] showed restricted hip range of motion . . ., difficulty getting up from a chair, pain sensation over both lower extremities, and restricted range of motion of the lumbar spine," and treatment in 2021, 2022, and 2023 yielded the "same examination results" (id.);

- in January and March 2021, Dr. McGrath noted "slow ambulation with a stiff back, mild distress, limited musculoskeletal range of motion, pain with right hip range of motion, . . . tenderness of the paraspinal region at L3 and the iliolumbar region, and limited range of motion . . . of the spine," and "throughout 2021 and 2022, . . . [Plaintiff's] examinations [] remained the same" (id.);

- "[a] lumbar MRI of August 2022 showed multilevel degenerative disc and facet disease resulting in mild left foramina[l] stenosis at L1-L2" (id.);

- in November 2022, "[a]n MRI of the cervical spine showed multilevel cervical spondylosis resulting in multilevel mild spinal canal narrowing and varying degrees of neural foraminal narrowing most pronounced and severe on the right at C5-C6" (Tr. 25-26); and

- "[i]n March 2023, . . . [Dr. McGrath's e]xamination showed . . . 3+ effusion of the right knee, . . . tenderness of the paraspinal region at L3 and the iliolumbar region, and limited range of motion of the lumbar spine" (Tr. 26).

Given the abundance of objective evidence discussed by the ALJ and bulleted above that supported Plaintiff's reports of severe pain, the ALJ's reliance on other, more neutral or normal objective evidence provided only a moderate degree of support for the ALJ's decision to discount Plaintiff's subjective symptom reporting.

On balance, the Court cannot find that the ALJ supported her evaluation of Plaintiff's subjective symptom reports with

28

substantial evidence. As discussed above, the ALJ's reliance on A)
Plaintiff's use of alcohol while taking narcotic pain medication
without any explanation of the impact of that use on the
consistency of his pain reports (see Tr. 26), B) a purported 10-
month gap in Dr. McGrath's treatment records that likely did not
exist (see id.), and C) the difference between Plaintiff taking
Enbrel for one versus two years without an explanation of the
relevance of that discrepancy (see Tr. 27), all fail to support the
ALJ's discounting of Plaintiff's subjective symptom reports.
Moreover, the ALJ's failure to sufficiently account for the
qualifications Plaintiff placed on his ability to engage in daily
activities (see id.) rendered the ALJ's reliance on those
activities of little relevance to her decision to discount
Plaintiff's subjective statements. Accordingly, the ALJ's
discussion of the objective medical evidence constitutes the only
remaining rationale supporting her subjective symptom analysis.
However, "the ALJ . . . may 'not disregard an individual's
statements about the intensity, persistence, and limiting effects
of symptoms solely because the objective medical evidence does not
substantiate' them." Arakas v. Commissioner, Soc. Sec. Admin., 983
F.3d 83, 95 (4th Cir. 2020) (quoting SSR 16-3p, 2017 WL 5180304, at
*5); see also 20 C.F.R. § 404.1529(c)(2).

In light of the ALJ's above-described failure to support her evaluation of Plaintiff's subjective symptom reports with substantial evidence, the Court will order remand.

## 2. Assessment of Dr. Hatfield's Opinions

Plaintiff's second and final assignment of error maintains that "[t]he ALJ's RFC determination is not supported by substantial evidence and is the product of legal error because she improperly evaluated the medical opinion of [consultative psychological examiner] [Dr.] Hatfield[ ]." (Docket Entry 8 at 14 (bold font and block formatting omitted); see also Docket Entry 10 at 5-6.) In view of the Court's finding on Plaintiff's first assignment of error that the ALJ failed to support her analysis of Plaintiff's subjective symptom reporting with substantial evidence, and the fact that, upon remand, the ALJ must reassess the persuasiveness of medical opinions (including those of Dr. Hatfield) in light of any re-evaluation of Plaintiff's subjective symptoms reporting, no need exists to address Plaintiff's arguments directed at the ALJ's prior, now-moot assessment of Dr. Hatfield's opinions.

## III. CONCLUSION

Plaintiff has established an error warranting relief. Following remand, the ALJ should undertake "every reasonable effort" to obtain any available records from Dr. McGrath for the time frame between October 7, 2021, and August 10, 2022. SSR 16-3p, 2017 WL 5180304, at *5 (providing that ALJ "will not evaluate

30

a[claimant]'s symptoms without making every reasonable effort to obtain a complete medical history," which consists of the claimant's records "for at least the 12 months preceding the month in which he or she filed an application" (emphasis added) (citing 20 C.F.R. § 404.1512(b)(ii))).

    **IT IS THEREFORE ORDERED** that the Commissioner's decision finding no disability is **VACATED,** and that this action is **REMANDED** under sentence four of 42 U.S.C. 405(g) for further administrative proceedings, to include 1) re-evaluation of Plaintiff's subjective symptom reports on the basis of a complete medical record and in accordance with SSR 16-3p, and 2) a redetermination of Plaintiff's RFC.

      /s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

September 22, 2025